# INTERSTATE TRANSIT LINES v. CRANE.

## No. 1640.

Circuit Court of Appeals, Tenth Circuit.
Sept. 15, 1938.

On Rehearing Jan. 6, 1939.

E. G. Knowles, of Denver, Colo. (T. W. Bockes, of Omaha, Neb., and Hughes & Dorsey, of Denver, Colo., of counsel, on the brief), for appellant.

C. D. Bromley, of Denver, Colo. (F. E. Dickerson and T. J. Morrissey, both of Denver, Colo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

This action was brought in the District Court of Second Judicial District of the State of Colorado by H. D. Crane as plaintiff against the Interstate Transit Lines as defendant to recover damages alleged to have been sustained by him on account of an alleged libel occasioned by defendant. It was in due course removed for trial to the United States District Court for the Eastern District of Colorado.

The parties when not specifically named by reference will be referred to in the order in which they appeared in the trial court.

At close of all the evidence motion on part of defendant was interposed for a directed verdict, same being denied and exception saved. A verdict being returned in favor of plaintiff for $500, judgment was entered thereon, from which this appeal has been duly prosecuted.

Defendant was engaged in the operation of buses in interstate and intrastate commerce, with a depot and terminal facilities in the City of Denver, Colorado. On or about June 1, 1932, plaintiff was employed by defendant on a commission basis to sell tickets at Denver. Required to furnish a bond, plaintiff made application for same to the National Surety Company, which among other things provided that it shall "make good and reimburse to the employer any and all pecuniary loss of money, securities, or other personal property belonging to the employer, or in its possession as a common carrier, bailee, or warehouseman, sustained by the employer by or through the personal dishonesty or culpable negligence of any employee, for whom the company is or shall have become surety hereunder, in connection with the duties pertaining to the positions to which he has been or may be appointed by the employer."

Plaintiff continued to work for defendant until July 3, 1933. On September 6, 1933, defendant wrote to said Surety Company as follows: "Mr. Harold Dan Crane, former Commission Agent, Denver, Colorado, is owing this company an amount of $9.45 which represents irregularity in the reporting of ticket sales while acting as our agent. We are continuing our efforts to collect this amount from Mr. Crane and will advise you further in due course."

On September 19, 1933, defendant again wrote to the Surety Company that a further audit disclosed that Crane undersold two tickets to Paducah, Kentucky, in amount of $2, making an additional amount of $3.60 due defendant, and that total amount of its claim under the bond was $13.05. On October 18, 1933, defendant stated to the Surety Company that it understood Crane had left Denver and was in Kansas City. On November 6, 1933, defendant informed the Surety Company that it had been unable to locate Crane and for the Surety Company to consider such letter as a formal claim for $13.05 on the bond. On January 15, 1934, defendant again wrote the Surety Company that a further audit disclosed that Crane had reported that a ticket from Denver to Chicago was sold for $2.35, and that the correct fare at the time was $16.85, which, less $2.35 reported by Crane, with 10 per cent commission to be allowed, resulted in a net amount due the Transit Lines of $13.05, and asked the Surety Company to consider such letter as a formal claim against the bond of Crane for said sum, which it stated was the amount of loss sustained in that particular transaction. The two claims of defendant amounting to a total of $26.10 were by the Surety Company paid to defendant.

On September 5, 1934, thereafter Crane was employed on a commission basis by the Burlington Transportation Company as a collector and salesman of bus transportation tickets. Requested to furnish a surety bond with the National Surety Company, Crane made application to said company for such bond, which was refused on account of the previous claims made by defendant which had been paid. Thereupon Crane lost his position with the Burlington Company.

On the trial Crane testified that while he was employed by the defendant he sold tickets for it on both Union Pacific Stages and Coast-to-Coast Line Stages out of the office at 1401 Seventeenth Street, Denver, and that defendant E. S. Haverly was during such period superintendent of Union Pacific Stages and Coast-to-Coast Line Stages; M. D. Gleason as City Passenger Agent his immediate superior, bringing

him numbered tickets for which he signed a receipt, and Crane keeping a daily record of the tickets sold which included an original and two duplicates, the original going to the auditor's office in Omaha, Nebraska, the first copy to the superintendent's office, and the other copy retained by him (Crane); that such reports were made daily by him and checked every morning by Gleason or some other official of the defendant company, showing the tickets sold by number and destination, the price of each, with a total of the amount of tickets sold, the percentage commission, and the net amount to be returned to the company; that there were also places for notations as to correction notices and credit papers; that he received 10 per cent of the gross amount of the tickets sold; that the reports were picked up daily between 7 and 9 o'clock each morning by either Gleason, or Olson the bookkeeper, who worked under Gleason; that the one checking such daily statement or report told him the amount of money due when he paid same; that on July 3, 1933, Gleason discharged him at the time, saying "he couldn't have plaintiff arguing with passengers"; that Crane when checking his office, asked him "if that cleared it," and Gleason said, "yes", when he turned over to Gleason the balance due as shown.

The Union Pacific Stages and Coast-to-Coast Line Stages were operated by defendant.

Crane later went to Kansas City, remained there about six months and then returned to Denver where on the street he met Gleason who informed him that he, Crane, owed the Transit Lines some money on account of being short $9.50. They then looked at the records and nothing more was said. Shortly afterward Crane went to Spokane, Washington, where he remained until February, 1935. Returning again to Denver he started to work for the Burlington System. Thereafter, having difficulty in making a bond, he and Murphy, auditor for Burlington, talked to Mr. Howley of the bonding company in Denver and subsequently had a conversation with Gleason, Howley and Haverly. Shortly thereafter Crane wrote Haverly concerning his alleged shortage as follows:

"In reference to your claim with the National Surety Co. for $26.10, which I understand that they have paid, I am enclosing reports that, to the best of my knowledge, said claims have reference to.

"Claim No. 1. May 7th to May 7th report shows $2.00 correction notice was paid and signed for by A. R. Olson for which I have his signature.

"Claim No. 2. Ticket B 1,393,634 and B 1,393,635 reading from Denver to Paducah, Ky., total fare of $35.40. In going over my reports I find another Paducah, Ky., tickets that were sold for $17.85, which I believe was the rate used at that time.

"Claim No. 3. This report shows ticket No. A 1,188,824, reading Denver to Chicago, as the figures were blurred, but as I check over I must 'have exchanged a Coast to Coast ticket in on said ticket, but as my reports do not show it, I wish you would check this against the auditor's stub.

"Claim No. 4, June 3, 1933, shows credit due $.55.

"Claim No. 5. Credit due $1.00.

"Claim No. 6, mistake in addition and not giving credit on refund tickets 9452 and 9451, total $12.00.

"If you will check this over with the auditor and let me know at your earliest convenience, I will certainly appreciate it as this is very urgent."

Haverly, upon its receipt, immediately transmitted same to the auditor of the defendant at Omaha, requesting that he go into the matter as Crane desired to have it cleared up so that it would not interfere with his bond with the Burlington Company which was to be furnished by the National Surety Company. Thereafter, Crane asked Haverly if he had heard from Omaha and Haverly told him that they had their money from the Surety Company which was the end of it. While Crane was attempting to get the matter cleared up so that he could get the new bond he told Gleason and Haverly that he was willing to pay any amount which might be due the Transit Lines if the matter was put up to him on any other basis than that of embezzlement, stating that according to his reports he did not recognize any liability.

The claims of irregularity, based on remittance sheets, are as follows:

That of June 3, 1933, showing that Crane charged himself with and paid $43.12, whereas defendant admitted that Crane should have paid only $42.50, leaving a credit to Crane of 55 cents.

That of June 18, 1933, showing that Crane charged himself with and paid $28.90, whereas defendant admitted that he

should have paid only $27.90, leaving a credit to Crane of $1.

That of June 21, 1933, showing total ticket sales of $53.80, which by proper addition should have been $63.80, making a difference owing to the Transit Lines, after deducting $1 commission, of $9.

That of May 7, 1933, showing that $7.40 was due defendant but claimed by it that only $5.40 was received.

That of June 16, 1933, showing two tickets to Paducah, Kentucky, sold at $17.70 each and paid for by Crane on that rate, but defendant claimed the proper charge for these tickets was $19.90 each and that Crane therefore owed defendant an additional $3.60, the claim with proper credits totaling $13.05.

That of June 20, 1933, showing a ticket sale to Chicago for $2.35 cash, and defendant claiming that the rate for a ticket to Chicago was $16.85 and that Crane therefore owed it less 10 per cent commission $13.05, this amount constituting the second claim filed by defendant with the Surety Company.

■ In an action for libel claims of an employer filed with a Surety Company which has bonded its employees and all correspondence relative thereto between the two concerning such liability are qualifiedly privileged. Sunley v. Metropolitan Life Ins. Co., 132 Iowa 123, 109 N.W. 463, 12 L. R.A.,N.S., 91. The rule there announced was expressly approved by the highest court of the state in which libel is claimed to have been uttered. Jackisch v. Quine, 62 Colo. 72, 160 P. 186, and Morley v. Post Printing & Publishing Co., 84 Colo. 41, 268 P. 540.

■ As such statements are only qualifiedly privileged, an action for libel by an employee is not barred, but such privilege must be overcome by proof of actual malice, the burden resting upon the employee. Morley v. Post Printing & Publishing Co., supra, and Sunley v. Metropolitan Life Ins. Co., supra.

■ In order for plaintiff (Crane) to prevail, it is essential that he establish that defendant's claims were libelous and malicious.

Athough communications of defendant to the Surety Company did not contain language specifically accusing Crane of embezzlement, same did charge irregularities and demand reimbursement from the Surety Company therefor, the bond covering "personal dishonesty or culpable negligence of an employee."

In Jackisch v. Quine, supra, it is said [page 187]: "The words must be taken and considered in their commonly accepted meaning, and there is no doubt that people generally would understand that the person to whom they were applied was guilty of wrongfully converting to his own use the funds or property of his employer. Taking this view, we must hold that, used as they are charged to have been in this complaint, the words are actionable per se."

See, also, Morley v. Post Printing & Publishing Co., supra, and Sunley v. Metropolitan Life Ins. Co., supra.

■ Was there sufficient evidence to meet plaintiff's burden to establish that the communications were made by defendant with malice?

Remittance sheet of May 7, 1933, was made up in triplicate, the original forwarded to defendant's auditor at Omaha, first copy being retained by defendant in Denver, and the other by Crane, which disclosed that the total ticket sales for that day amounted to $6, commission of 60 cents deducted left $5.40. A correction notice of $2 was added, making total of $7.40, which was supposed to have been remitted to defendant. "7.40" is written over "5.40". On such sheet appears the following: "Rec'd $7.40, 5–8–33, A. R. Olsen," this receipt being in Olson's handwriting, with no erasure or obliteration. Remittance sheet sent to defendant at Denver discloses total ticket sales of $6, less commission of 60 cents, with correction charge of $2, and remittance shows either "7.40" written over "5.40" or "5.40" written over "7.40." On face of remittance appears "Recd 5.40, 5–8–33, A. R. Olson." Crane's receipt clearly shows that he remitted $7.40 and since Crane has the receipt of an officer of defendant, remittance sheet of defendant which shows $5.40 was undoubtedly a mistake of the defendant's own officers which by proper investigation should have been discovered by them.

Remittance sheet of June 16, 1933, shows two sales of tickets to Paducah, Kentucky, for $17.70 each, which amount less commission was paid by Crane to defendant and receipted for by Gleason, an officer of defendant, Gleason making up the sheet himself showing that Crane owed $17.70 on each of these tickets, same being in Gleason's handwriting.

Remittance sheet of June 20, 1933, shows ticket sale from Denver to Chicago with fare listed at $2.35. This figure is written over an erasure of a prior figure, which plaintiff claimed was $16.85 and which Gleason himself admitted was in excess of $10. All amounts on remittance sheets were in Crane's handwriting except the figures $2.35 which were in Gleason's handwriting. Crane testified that the original amount written on such report sheet was $16.85 until it was erased, and Gleason testified that it is apparent from the original sheet that the original amount under the erasure was above $10. Crane testified that to the best of his recollection he had taken in an unused portion of a Coast to Coast ticket on the sale to Chicago, which after being credited to the $16.85 fare left cash balance of $2.35, and not knowing how to handle such a credit, that Gleason handled the transaction himself.

Remittance sheet of June 21, 1933, shows a mistake in addition whereby the total amount of ticket sales should have been $63.80 instead of $53.80. Gleason examined this report at the time it was made out and turned in by Crane and receipted for $37.-60 which was due according to the erroneous addition. Such mistake was as much Gleason's as Crane's.

Crane was never advised by defendant of any alleged shortages until after he had left its service, and when advised of the alleged shortages he stated that he would pay the defendant any amount due if it was put on any basis other than embezzlement.

The only actual shortage, resulting from erroneous addition, by proper investigation by defendant's officers making such charge would have been discovered by them, and the discrepancies disclosed, but Crane was not advised of such contention until long after he had left its service.

Throughout all of the transactions the auditor of defendant at Omaha acted on the advice of its employees, Haverly and Gleason, who were in a position whereby a careful check by them would have disclosed all of the discrepancies. Neither were claims made until plaintiff had left its service nor was he informed of any shortages for a considerable time thereafter.

The evidence introduced on part of Crane tended to establish that said claims were not properly investigated and, therefore, negligently made, with doubtful good faith and with indifference to plaintiff's proper interests from which malice may be found. The court was justified in submitting the issues to the jury.

In Stevenson v. Morris, 288 Pa. 405, 136 A. 234, 50 A.L.R. 335, it is said [page 235]: "To claim the benefit of the privilege and absolve himself from suspicion of being actuated by malicious motives, defendant was bound to use reasonable effort to ascertain the truth of charges of incompetency directed against the person engaged in the work, and to refrain from the use of inflammatory and exaggerated statements."

In Hodgkins v. Gallagher, 122 Me. 112, 119 A. 68, it is said [page 69]: " * * * The defendant's privilege is a qualified privilege and is a defense only if the defamatory words were spoken in good faith, without actual malice * * * and with reasonable grounds for believing their truth * * *."

In J. Hartman & Co., Inc., v. Hyman, 287 Pa. 78, 134 A. 486, 48 A.L.R. 567, it is held that: " 'Privileged communication' is one made on proper occasion, from proper motive, in proper manner, with reasonable or probable cause," and that: "One relying on immunity of privileged communication must prove all facts necessary to bring himself within exception," and that: "Want of reasonable care and diligence to ascertain truth before giving currency to untrue communication destroys privilege." See, also, Lewis v. Carr, 178 N.C. 578, 101 S.E. 97, and Sunley v. Metropolitan Life Ins. Co., supra.

As to the contention that the conversations which occurred in 1935 between Crane, Gleason, Haverly and Howley, and the letter of November 1, 1935, written by Crane to Haverly, and from Haverly to the auditor and the auditor to Haverly in November, 1935, were not admissible on the issue of malice, in Davis v. Starrett, 97 Me. 568, 55 A. 516, it is said [page 518]: "And as bearing upon the question of actual malice it is competent for the plaintiff to show that the defendant has repeated the slander charged, or has used the same or similar words, upon other occasions." See, also, Lightner v. Osborn, 142 Va. 19, 127 S.E. 314; Williams Printing Co. v. Saunders, 113 Va. 156, 73 S.E. 472, Ann.Cas.1913E, 693; Scott v. Times-Mirror Co., 181 Cal. 345, 184 P. 672, 12 A.L.R. 1007; Stokes v. Morning Journal Association, 72 App.Div. 184, 76 N.Y.S. 429; Colbert v. Journal Publishing Co., 19 N.M. 156, 142 P. 146; Larrabee v. Minnesota Tribune Co., 36 Minn. 141, 30 N.W. 462; Walgreen Co. v.

Cochran, 8 Cir., 61 F.2d 357, and Kroger Grocery & Baking Co. v. Yount, 8 Cir., 66 F.2d 700, 92 A.L.R. 1166.

Limited to the purpose of the introduction of such evidence to show the intent with which the claims were made, it was admissible.

■ As to the contention that plaintiff (Crane) waived rights by filing application for bond with the Surety Company to cover his employment with the Burlington, Surety Company being granted right to investigate and any action against any former employer for statements so made being waived, one of the issues submitted to the jury was as to good faith. There was sufficient evidence on which to base such issue which was resolved by jury's verdict against the defendant.

The judgment of the lower court should be affirmed.

## On Petition for Rehearing.

■ It is stated in petition for rehearing that briefs "were filed prior to the decision in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. But this decision certainly does not require that Federal court precedents should be ignored."

In the Tompkins Case it is held [page 822]: "Except in matters governed by the Federal Constitution or by acts of Congress, the law to. be applied in any case is the law of the state. * * * There is no federal general common law."

The data having been supplied by appellant's agents from Denver, Colorado, it was in effect transmitted by auditor Hall from Omaha, Nebraska, to the Surety Company at Kansas City, Missouri. During the oral argument on the petition, it was conceded by both sides that under the weight of authority the law of Missouri governed, the law of Colorado being in effect the same.

■ The declaration in the pleading is that "subsequently and to-wit, on or about the month of March, A. D. 1934, said defendant maliciously, falsely, wilfully, and with reckless and wanton disregard of plaintiff's rights and with no reasonable or probable cause to believe the same, notified * * * the National Surety Company a corporation, to the effect that said plaintiff had embezzled from said defendant while in the employ of said defendant as aforesaid, the sum of Twenty-six and 10/100 ($26.10) Dollars."

Records and statements made and caused to be made by Gleason at Denver, Colorado, passenger agent for appellant, whose duty it was to make a daily check of Crane's ticket sales, to examine and oversee his daily reports and to receipt for and to receive all monies payable to the company, who was the superior of A. R. Olson, defendant's bookkeeper, and who during these dates assisted Gleason in the particulars complained of, and E. S. Haverly, the Superintendent of defendant, with headquarters at Denver, in charge of both Union Pacific Stages and the cut rate Coast-to-Coast Lines, both Haverly and Gleason occupying responsible executive positions, Gleason through his communications with Hall effected the filing of claims against the Surety Company under appellee's bond, Hall, the auditor, testifying that the wire to him by Gleason signed with Haverly's initials was "the only basis for filing the first claim." With respect to other claims, Hall said he did not recall that he examined any of the records personally before he sent the letter to the Surety Company, but that he communicated with Gleason or Haverly before sending same.

Hall's letter to Haverly states: "Each and every one of these matters were forwarded to Mr. Gleason who should be more familiar with actual conditions than we here in Omaha with respect to his personal contacts with Mr. Crane at the time he was endeavoring to get them straightened out."

When Crane made his request for a correction as to the charges, Hall placed the matter squarely in the hands of Haverly, to act in the premises.

In Conrad v. Allis-Chalmers Mfg. Co., 228 Mo.App. 817, 73 S.W.2d 438, it was urged that there was no liability "as to the corporate defendant" as "such defendant neither knew of, authorized, or ratified the act of defendant Voorhees as its agent in writing" the letter. [Page 450.] The appellate court held against said contention as to such corporate defendant's liability as "the act of the defendant was the act of the corporation," the court saying: "The corporate defendant's liability does not rest upon an express authorization of the particular act in question or upon immediate knowledge or ratification by it of such act, but upon the fact that the defendant Voorhees was acting for it in the conduct of its business within the authorized line of his employment. Under such circumstances, it not only became liable for defendant Voorhees' act, but liable with Voorhees,

and to the exact same extent as Voorhees. Priest v. Central State Fire Ins. Co., 223 Mo.App. 122, 9 S.W.2d 543, loc. cit. 544; Connell v. A. C. L. Haase & Sons Fish Co., 302 Mo. 48, 257 S.W. 760; Haehl v. Wabash Railway Co., 119 Mo. 325, loc. cit. 343, 24 S.W. 737."

To the same effect, see also Cook v. Globe Printing Co., 227 Mo. 471, 127 S.W. 332; Sinclair Refining Co. v. Fuller, 190 Ark. 426, 79 S.W.2d 736; Weber v. Butler, 81 Hun 244, 30 N.Y.S. 713; Morrison v. Press Publishing Co., 59 N.Y.Super.Ct. 216, 14 N.Y.S. 131; Scott v. Times-Mirror Co., 181 Cal. 345, 184 P. 672, 12 A.L.R. 1007; Brown v. Massachusetts Title Ins. Co., 151 Mass. 127, 23 N.E. 733; Post Pub. Co. v. Hallam, 6 Cir., 59 F. 530.

In Solow v. General Motors Truck Co., 2 Cir., 64 F.2d 105, the agent who was guilty of malice was held not to be acting within the scope of his authority.

In the instant case, Gleason had reason not only to know that the data that he furnished auditor Hall would be passed on to the Surety Company, but also in effect induced the data to be passed on.

The court instructed the jury that the burden rested upon the plaintiff (appellee). This court on appeal, where there is substantial evidence to sustain the issue may not weigh the evidence.

Appellant states that this court "appears to regard the testimony of Crane as truthfully establishing all the facts and disregards much of the other evidence which conclusively rebuts Crane's statements." The jurors evidently believed Crane under the controverted issues as submitted to them under instruction of trial court.

We adhere to our former opinion. The judgment of the District Court is affirmed.